Scott M. Riemer (SR 5005)
RIEMER & ASSOCIATES, LLC
Attorneys for Plaintiff
60 East 42nd Street, Suite 1750
New York, New York 10165
(212) 297-0700
sriemer@riemerlawfirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

RICHARD ZOELLER,                                    16 CV __3561__

                              Plaintiff,            **COMPLAINT**

            -against-                               ECF CASE

STANDARD LIFE INSURANCE
COMPANY OF NEW YORK,

                              Defendant.
----------------------------------------------------------------X

Plaintiff Richard Zoeller ("Zoeller"), by his attorneys, Riemer & Associates, LLC, complaining

of Defendant Standard Life Insurance Company of New York ("Standard") alleges:

1.      This is an action arising under the Employee Retirement Income Security Act of 1974,

as amended ("ERISA"), 29 U.S.C. §1001, *et seq.*, to recover benefits due under an employee benefit

plan, to clarify the rights of Plaintiff to future benefits under such plan, and to recover attorneys' fees

and costs.

2.      This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29

U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  Under Section 502(f) of ERISA, 29 U.S.C. § 1132(f), this

Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3.      Venue is properly in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. §

1132(e)(2), in that the Defendant resides or may be found in this District.

## PLAINTIFF'S PARTICIPATION IN THE
## <u>LONG TERM DISABILITY PLAN</u>

4.      At all relevant times, Plaintiff was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), in the Structure Tone, Inc. Group Long Term Disability Plan (the "LTD Plan").

5.      At all relevant times, the LTD Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

6.      At all relevant times, Standard is and has been the claims administrator of the LTD Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

7.      At all relevant times, Standard has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

8.      Long term disability benefits under the LTD Plan have been insured in accordance and pursuant to Group Policy No. 433936-A issued by Standard.

9.      Plaintiff was employed as a Compliance Auditor/Controller for Structure Tone, Inc.

10.      As an employee of Structure Tone, Inc., Plaintiff was provided with long term disability insurance coverage under the LTD Plan.

## <u>STANDARD OF REVIEW</u>

11.      The LTD Plan document does not contain language granting Standard <u>discretionary</u> authority to determine the eligibility for benefits or to interpret the terms of the LTD Plan.

12.      The LTD Plan contains a section titled "Allocation of Authority," which allocates to Standard duties to determine the eligibility for benefits and to interpret the terms of the LTD Plan, but not with discretion.

13.      Upon information and belief, the adverse decisions in this case were rendered by employees of Standard Insurance Company ("SIC"), not Standard.

14.      The LTD Plan document does not contain language granting SIC discretionary

authority to determine the eligibility for benefits or to interpret the terms of the LTD Plan.

15.     During the claims and administrative review processes, Standard failed to comply with the Department of Labor's claims-procedure regulations, and its failure to comply was neither inadvertent nor harmless.

16.     Upon information and belief, Standard has not adopted claim procedures in accordance with the Department of Labor regulations.

17.     As a result, the *de novo* standard of review applies.

<h2 style="text-align:center"><u>THE ADMINISTRATIVE PROCESS</u></h2>

18.     Plaintiff filed his claim for LTD benefits alleging that he became disabled as of October 11, 2012 as a result of Lyme disease and Bartonellosis.

19.     Under the LTD Plan, "Disability" is defined as follows:

You are Disabled if you meet the following definitions during the periods they apply: […]

A. Own Occupation Definition of Disability

During the Benefit Waiting Period [180-days] and the Own Occupation Period [24 months] you are required to be Disabled only from your Own Occupation.

You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:

1.   You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and

2.   You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.

Note: You are not Disabled merely because your right to perform your Own Occupation is restricted, including a restriction or loss of license.

During the Own Occupation Period you may work in another occupation while you meet the Own Occupation Definition of Disability.  However, you will no longer be Disabled when your Work Earnings from another occupation meet or exceed 80% of your Indexed Predisability Earnings.  Your Work Earnings may be Deductible Income. …

Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy. If your Own Occupation involves the rendering of professional services and you are required to have a professional or occupational license in order to work, your Own occupation is as broad as the scope of your license.

Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted. In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

B. Any Occupation Definition of Disability

During the Any Occupation Period you are required to be Disabled from all occupations.

You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonably continuity the Material Duties of Any Occupation.

Any Occupation means any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation and cannot be reasonably modified or omitted. In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

20.     Plaintiff is precluded from working in "Any Occupation" due to the physical and cognitive symptoms associated with his Chronic Lyme Disease, Bartonellosis and Babesia, which include, without limitation: severe fatigue; headaches; visual disturbances; ringing in his ears; photosensitivity; pain throughout his body; joint stiffness; weakened strength; decrease in fine motor

4

skills; gastrointestinal disturbance; irritability; mood disturbance; inability to deal with crowds; problems with interpersonal relationships; memory problems; mental confusion; problems with concentration, focus and attention; insomnia and night sweats.

21.     Plaintiff last worked for Structure Tone, Inc. on October 10, 2012.

22.     Plaintiff began treating with Lyme Disease Specialist, Bernard Raxlen, M.D. on or about July 9, 2012.  At that time, Plaintiff noted that he was exposed to ticks all the time, had rashes all over his body in the past, and was experiencing problems sleeping, cognitive issues, heart muscle issues, and headaches.  Dr. Raxlen prescribed antibiotics and supplements.

23.     A Brain Spect dated July 24, 2012 revealed a "[q]uestionable area of decreased perfusion in the left temporal lobe."

24.     A Polysomnogram performed in August 2012 revealed severe obstructive sleep apnea.

25.     In addition to the oral antibiotics and supplements, and in order to better treat his chronic Lyme disease, on or about September 12, 2012, Dr. Raxlen prescribed a PICC line placement for IV antibiotic therapy.

26.     Plaintiff subsequently had the PICC line inserted on October 22, 2012, and self-administered daily antibiotic infusions between October 2012 and November 2013.

27.     Plaintiff then underwent periodic intramuscular Bicillan antibiotic injections beginning in January 2014.  These injections were prescribed by Dr. Raxlen, and administered by Dr. Levitan.

28.     An X-ray of the cervical spine dated November 16, 2012, revealed "Degenerative changes with right-sided neural foraminal narrowing.

29.     Plaintiff underwent chiropractic care with Dr. Kurt Schagen for his neck pain, back pain and headaches.  Zoeller treated with Dr. Schagen on over 20 occasions between November 16, 2012 and April 29, 2013.

30.     In an Attending Physician's Statement ("APS") dated March 29, 2013, Dr. Raxlen diagnosed Zoeller with Lyme disease and Bartonellosis, with symptoms including: fatigue, headaches, visual disturbance, ringing in ears, photosensitivity, pain, gastrointestinal disturbance, mood disturbance, memory problems, mental confusion and night sweats.  Dr. Raxlen recommended that Plaintiff stop working on October 11, 2012, and stated he cannot determine when Plaintiff will be able to return to work.

31.     In an APS dated March 23, 2013, treating physician, Melanie Levitan, M.D. also diagnosed Zoeller with Lyme disease and recommended that he stop working on October 10, 2012.

32.     In an office visit note dated March 14, 2013, Dr. Levitan noted that Zoeller's symptoms include fatigue, confusion, muscle pain, headaches, seething anger, and an inability to function before noon.

33.     Following a file review on April 26, 2013, Standard's in-house Nurse Consultant, Colleen Kirchoff, RN concluded that "The claimant has numerous symptoms of rage, irritability, nightmares, fatigue, confusion, muscle pain, neck pain, and headaches…The clmt has on-going L[imitations] & R[estrictions] related to his numerous physical and mental symptoms, which would preclude any level of full-time sustainable work activity.  The clmt's prognosis is fair-favorable, given that [*sic*] his slow but gradual improvement."

34.     Via letter dated May 20, 2013, Standard approved Plaintiff's LTD claim finding that he became disabled on October 11, 2012, and that benefits begin on April 8, 2013 (following the 180-day Benefit Waiting Period).

*Plaintiff Ongoing Claim For LTD Benefits and Standard's Neuropsychological IME*

35.     While his LTD application was pending, Plaintiff underwent a 2-day Neuropsychological Evaluation with Leo J. Shea III, Ph.D. on May 4 and May 5, 2013.

36.     In his report dated June 3, 2013, Dr. Shea explained that the neuropsychological testing revealed that Zoeller suffers from cognitive weaknesses in speed of processing information (especially auditory information), reading rate, reading comprehension (of both simple and complex material), visual attention (under timed conditions and in the presence of distractions), and auditory recall (both on contextualized information and list-learning tasks).

37.     In his June 3, 2013, report, Dr. Shea stated, "It is apparent that his average but comparatively slower speed of processing affected his performance on various tasks administered. This can have a negative impact on his ability to efficiently analyze the broad range of information that he has to confront on a daily basis and to render effective decisions based on environmental factors, human resources and operations analysis that are an inherent part of his position.  Due to his demonstrated reductions he will be at a disadvantage when attempting to make the rapid turn-around and often spontaneous decision which can have a significant impact on company decisions and work with clients."

38.     Via letters dated February 12, 2014 and February 28, 2014, Standard requested that Plaintiff attend an independent neuropsychological evaluation with a physician of their choice.

39.     At Standard's request, Plaintiff underwent neuropsychological testing with J. Robert Yohman, Ph.D. from PsyBar LLC ("PsyBar") on April 2 and April 3, 2014.

40.     Upon information and belief, Dr. Yohman resides and practices in Texas.

41.     Upon information and belief, Dr. Yohman travelled to Massachusetts specifically for Plaintiff's neuropsychological evaluation.

42.     Plaintiff's neuropsychological evaluation with Dr. Yohman took place at a hotel meeting room in Lenox, Massachusetts.

43.     Upon information and belief, Dr. Yohman is not licensed to practice in the State of Massachusetts.

44.     In his report dated April 6, 2014, Dr. Yohman erroneously found: no valid evidence of any cognitive or psychological problems; evidence of exaggeration or fabrication of symptoms; and an allegation of "secondary gain factors." Dr. Yohman incorrectly diagnosed Zoeller with Malingering (based in part on the results of the Minnesota Multiphasic Personality Inventory – 2 ("MMPI-2")).

45.     Dr. Yohman also rejected the opinions of Dr. Shea, alleging that the test was not consistent with slowed processing speed, and that average performance in a person with above average intelligence does not represent a deficit in cognitive functioning.

*Standard's Termination of Plaintiff's Claim for LTD Benefits*

46.     On or about May 29, 2014, Mary McGair, Supervisor, Employee Benefits informed Plaintiff of Standard's determination to discontinue his claim for LTD benefits beyond May 29, 2014.

47.     In doing so, Standard relied on the above referenced neuropsychological evaluation by Dr. Yohman, and on a paper review by John L. Brusch, M.D. of MES Solutions ("MES").

48.     As discussed above, Dr. Yohman erroneously concluded that Plaintiff did not have any cognitive or psychological impairments, and diagnosed him with Malingering.

49.     Despite acknowledging that Zoeller has had multiple exposures to ticks, and suffers from symptoms including severe fatigue, headaches, visual disturbance, ringing in the ears, photosensitivity, diarrhea, mood disturbances, memory problems, mental confusion and night sweats, Dr. Brusch concluded that Zoeller's diagnosis of Lyme Disease is not supported by the medical records, and that he has no functional restrictions or limitations.

50.     In doing so, Dr. Brusch misapplied the reporting and diagnostic criteria for Lyme disease, and misinterpreted the requirements for a diagnosis of chronic Lyme disease.

51.     Dr. Brusch also ignored Zoeller's subjective complaints, the medical documentation and the opinions of his treating doctors; and improperly commented on the appropriateness of Zoeller's treatment.

*Plaintiff's Administrative Appeal of Standard's Termination*

52.     On or about November 20, 2014, Plaintiff formally appealed Standard's discontinuation of his LTD benefits and requested a 60-day deferral or extension of time to perfect his appeal.

53.     Via letter dated November 24, 2014, Standard granted Plaintiff's request and allowed Plaintiff an extension of time until January 19, 2015 to perfect his appeal.

54.     Via letter dated January 16, 2015, Plaintiff perfected his appeal by submitting additional medical and vocational evidence, including but not limited to: (1) Narrative/Rebuttal Report from Dr. Raxlen dated January 7, 2015; (2) Residual Functional Capacity ("RFC") Questionnaire from Dr. Raxlen dated December 29, 2014; (3) Rebuttal Report from Dr. Shea dated January 5, 2015; (4) Narrative Report from Dr. Levitan dated December 16, 2014; (5) RFC Questionnaire from Dr. Levitan dated November 10, 2014; (6) Medical Documentation from Dr. Kogan; and (6) Vocational Assessment from James Parker, CRVP, CRC dated January 2, 2015.

55.     In his Narrative/Rebuttal Report dated January 7, 2015, Dr. Raxlen stated that he diagnosed Plaintiff with Lyme Disease based on his symptoms; evidence of exposure to an endemic area with ticks; a positive Lyme serology; the July 24, 2012 Brain Spect; and the results of the neuropsychological evaluation with Dr. Shea.

56.     In his Narrative/Rebuttal Report dated January 7, 2015, Dr. Raxlen noted that Zoeller's symptoms include: fatigue, headaches, visual disturbance, ringing in his ears, photosensitivity, pain throughout his body, joint stiffness and weakened strength, decrease in fine motor skills, gastrointestinal disturbance, irritability, mood disturbance, memory problems, mental confusion, problems with concentration, focus and attention, insomnia and night sweats.

57.     In his Narrative/Rebuttal Report dated January 7, 2015, Dr. Raxlen indicated that Zoeller can sit for about 15 minutes at a time, and for up to 4 hours total – but with extended rest

periods, and that he can stand for about 10-15 minutes at a time and for less than 2 hours total per day – but with extended rest periods. He also noted that Zoeller has deficits in speed of processing, reading rate, reading comprehension, visual attention under timed conditions, *etc.* Dr. Raxlen stated, "Based on my extensive treatment history with Mr. Zoeller, I believe that he is totally disabled from both his own occupation as a Compliance Auditor and from any other occupation."

58.     In his Narrative/Rebuttal Report dated January 7, 2015, Dr. Raxlen disputed the findings of Standard's file review physician, Dr. Brusch.

59.     In his Narrative/Rebuttal Report dated January 7, 2015, Dr. Raxlen noted that "Dr. Brusch misapplied the Center for Disease Control ("CDC") criteria. It is important to note that the narrow surveillance criteria used by the CDC were intended for reporting and epidemiology purposes, not for diagnostic purposes. According to the CDC, Lyme disease is diagnosed based on the patient's signs, physical presentation and symptoms along with evidence that the patient was present in an endemic area with tick exposure over the course of months or years." Contrary to Dr. Brusch's opinion, Dr. Raxlen stated that Zoeller does suffer from Lyme disease and, although not meeting the reporting criteria, did have positive Lyme serologies in 2011, 2012 and 2014.

60.     In his Narrative/Rebuttal Report dated January 7, 2015, Dr. Raxlen also noted that Dr. Brusch did not comment on Zoeller's symptoms or the significant cognitive deficits found on Dr. Shea's evaluation, and that since Dr. Brusch never treated or met Zoeller, he is "in no position" to comment on the appropriateness of Zoeller's past and future treatment.

61.     In his Narrative/Rebuttal Report dated January 7, 2015, Dr. Raxlen stated, "I strongly disagree with Dr. Brusch's assessment of Mr. Zoeller's case and his failure to find any restrictions and limitations."

62.     In his RFC Questionnaire dated December 29, 2014, Dr. Raxlen noted that Zoeller suffers from pain in the neck, back, joints, shoulder, muscles and knees; general body aches; pain,

tenderness and cramping in the neck; peripheral neuropathy in the lower extremities; tingling/burning sensations; flu-like symptoms; chronic fatigue; and an "inability to sustain periods of rest/sleep, even throughout the night, results in further exhaustion/fatigue.  Patient had been diagnosed with sleep apnea for years…Pt. takes naps multiple times during day.  Fatigue also related to chronic muscle exhaustion."

63.     In his RFC Questionnaire dated December 29, 2014, Dr. Raxlen indicated that Zoeller can: sit for only 15 minutes at a time and for up to 4 hours total in an 8-hour workday – but "with extended rest periods"; stand for 10-15 minutes at a time; walk about 4 blocks; stand/walk for less than 2 hours total in an 8-hour workday – but "with extended rest periods"; only occasionally (11-33% of the time) turn his head left and right and look up; and rarely (1-10% of the time) look down and hold his head in a static position.

64.     In his RFC Questionnaire dated December 29, 2014, Dr. Raxlen noted that Zoeller has a neurocognitive impairment.  Dr. Raxlen stated that he has "intermittent confusion, short-term memory loss, inability to focus/concentrate, inability to analyze or remain on point.  Pt gets lost in thought and in speech.  Compromised executive function."  The doctor also indicated that Zoeller's symptoms frequently to constantly interfere with attention and concentration.

65.     In his RFC Questionnaire dated December 29, 2014, Dr. Raxlen further reported that Zoeller cannot handle even the smallest amount of stress; must take multiple unscheduled breaks to rest during the day; must get up to walk around every 15 minutes; and would likely be absent from work more than 4 days per month.  Dr. Raxlen concluded by stating "Pt. is still unable to work.  Pt. still suffers from reduced stamina, limited ability to focus/concentrate.  Pt. still requires periods of intermittent rest and is still undergoing IM Bicillin therapy, with twice weekly injections…"

66.     In his Rebuttal Report dated January 5, 2014, Dr. Shea indicated that according to Zoeller, he was distracted during the MMPI-2 as Dr. Yohman was scoring another examinee's test

11

and packed up his equipment during the test.  Dr. Shea stated: "Scoring an examinee's tests [and packing up equipment] at the same table while the examinee is attempting to concentrate on the test is not usual practice and can be a distracting element…The MMPI requires considerable concentration to thoughtfully answer the hundreds of questions posed.  Distracting environmental elements can affect a person's ability to maintain concentration and attend effectively to the questions."

67.     In his Rebuttal Report dated January 5, 2014, Dr. Shea indicated that the MMPI-2 was administered as the last test on the second day of testing, "which also calls into question [Zoeller's] fatigue level after two days of sustained testing for four hours each."

68.     In his Rebuttal Report dated January 5, 2014, Dr. Shea noted that Zoeller "did not report that Dr. Yohman was consistently distracting and thus, he did have the opportunity to perform at his functional best on many of the tasks administered over the two days.  Also, at least two of the effort tests that Dr. Yohman administered showed that Mr. Zoeller was working effortfully."

69.     In his Rebuttal Report dated January 5, 2014, Dr. Shea explained that there is no "secondary gain" for Zoeller as he only stands to receive $120,000 per year in LTD benefits versus his salary of $260,000 per year.

70.     In his Rebuttal Report dated January 5, 2014, Dr. Shea indicated that while Zoeller's performance demonstrated preserved functioning in many area, contrary to Dr. Yohman's opinion, the results of his evaluation do indeed show that Zoeller's processing speed was "well below expectation."

71.     In his Rebuttal Report dated January 5, 2014, Dr. Shea stated: "It is true that intelligence does not always "strongly and uniformly" correlate with all neurocognitive measures in certain higher individuals.  However, in Mr. Zoeller's case his innate intellect is not just above average, it is in the superior range as supported by several WAIS Indices.  His performances on a number of other measures, in the average range or lower, suggest challenges in domains that would impact the

required aspects of his senior management position and suggest that his production and efficiency would be impacted.  As such, they are not meaningless and do represent a relative decline in expected neurocognitive functioning."

72.     In his Rebuttal Report dated January 5, 2014, Dr. Shea also noted that "the bond needed to validate the results of an evaluation appears not to have been developed between Dr. Yohman and Mr. Zoeller during the clinical interview or the testing session," and that the failure to establish a bond between examiner and examinee affected the results of the evaluation.

73.     In her Narrative Report dated December 16, 2014, Dr. Levitan noted that despite antibiotic treatment, Zoeller developed cognitive dysfunction such as the inability to concentrate and impaired memory.  Dr. Levitan stated: "Mr. Zoeller is barely functional until the afternoon due to fatigue.  He has to rest frequently and is unable to handle complicated mental tasks.  He has had to restart intramuscular antibiotics as he had a severe flare when he stopped them recently."

74.     In her RFC Questionnaire dated November 10, 2014, Dr. Levitan diagnosed Plaintiff with chronic Lyme Disease, Bartonella and Babesia with symptoms including, without limitation: fatigue; a disrupted sleep pattern; chronic exhaustion headaches; joint and muscle inflammation; varying degrees of neck, back, knee and shoulder pain; problems with short-term memory; difficulty organizing tasks; difficulty with concentration and staying focused for extended periods; problems completing tasks.

75.     In her RFC Questionnaire dated November 10, 2014, Dr. Levitan found that Zoeller can: sit for about 20 minutes at a time and up to 4 hours total in an 8-hour workday "with extended periods of rest";  stand for about 15 minutes at a time; stand/walk and for less than 2 hours total in an 8-hour workday; only occasionally (11-33% of the time) turn his head to the left or right; and rarely (1-10% of the time) look up and down and hold his head in a static position.  Dr. Levitan stated that Mr. Zoeller's symptoms constantly interfere with attention and concentration, and that he is unable

13

to tolerate even low stress.

76.     In her RFC Questionnaire dated November 10, 2014, Dr. Levitan stated that "Richard tries to manage the fatigue by resting often throughout the day and by taking intermittent naps."  She noted that Mr. Zoeller does not handle stress very well, and that stress further compromises his immune system; results in frustration, decreased ability to focus and concentrate; irritability; problems dealing with others; and more fatigue, headaches and muscle pain.  Dr. Levitan further stated that "Richard does not have the ability to consistently perform occupational responsibility due to his reduced stamina, his reduced capacity to concentrate and to focus, his need for intermittent rest, the ongoing side effects of his medications, his continued need for twice weekly injections, as well as his need to attend to other medical and support therapies appointments."

77.     In his Report dated November 18, 2014, Dr. Kogan verified Zoeller's diagnosis of Lyme disease, and additionally diagnosed him with Chronic Fatigue Syndrome, Systemic Inflammatory Response Syndrome ("SIRS") and chronic diarrhea.  Dr. Kogan stated: "This patient has clear diagnosis of SIRS due to his symptoms and chronicity, SIRS is virtually proven here by Elevated TGFB1 (nearly 4 fold the normal at 8680) and elevated C4A (nearly 3 fold normal at 6864), especially in view of normal C3A."

78.     In his Vocational Assessment Report dated January 2, 2015, Parker found that: Zoeller's inability to sit for more than 4 hours per day precludes him from performing the requisite 6-hours of sitting required of sedentary work; Zoeller's inability to stand for more than 10-15 minutes at a time and for more than 2 hours total per day prevent him from performing the standing/walking requirements of sedentary work; Zoeller's need to frequently change positions result in him being off task due to the inability to sit and sustain computer-based tasks; Zoeller's inability to look up and down and side to side on a frequent basis, and his inability to keep his head in a static position to focus on a computer screen "significantly impair his ability to perform computer-based work tasks or desk

14

level sedentary demands"; and Zoeller's extreme fatigue, need for frequent breaks and need to lie down preclude him from any part-time or full-time work on a consistent and predictable basis.

79.     In his Vocational Assessment Report dated January 2, 2015, Parker also found that Zoeller's impaired concentration, focus and processing speed; his headaches; and his other cognitive deficits prevent him from making judgments and decisions; multi-tasking; performing detailed tasks; and performing extensive communications with problem sensitivity, selective attention, perceptual speed, and memory.

80.     In his Vocational Assessment Report dated January 2, 2015, Parker concluded that: "Based on the limitations established by Mr. Zoeller's physicians and practitioners, he is totally disabled from all employment.  It is this consultant's vocational opinion that more likely than not within a reasonable degree of vocational rehabilitation certainty, Mr. Zoeller is totally disabled from all work for which he could reasonably qualify by education, training, and experience and will remain so for the foreseeable future."

*Fully Favorable Determination by the Social Security Administration*

81.     On or about July 20, 2014, the Social Security Administration ("SSA") determined that Plaintiff was disabled under the SSA rules since October 10, 2012.

82.     The SSA's definition of disability is significantly more restrictive than Standard's as it requires the claimant to be unable to work in any occupation in the "national economy."

*Standard's Final Denial of Plaintiff's Claim For LTD Benefits*

83.     On or about April 17, 2015, Standard rendered a final decision on Plaintiff's appeal.

84.     In its April 17, 2015, letter, Standard erroneously determined that there was insufficient evidence to support a diagnosis of Lyme disease, but that "the medical evidence supports functional impairment due to somatic symptom disorder which has been present since October 10, 2012, when Mr. Zoeller ceased work."

85.     According to Standard, since a somatic symptom disorder is a mental disorder, Zoeller was only entitled to LTD benefits through April 8, 2015 – the end of 24 month limited pay period for disabilities "caused or contributed to by" a Mental Disorder.

86.     Standard paid Zoeller his LTD benefits through April 8, 2015, and terminated his benefits thereafter.  Zoeller has not received any LTD benefits past April 8, 2015.

87.     Standard's decision was based on paper reviews conducted by Esther Gwinnell, M.D. and Raymond J. Dattwyler, M.D., both from Exam Coordinators Network ("ECN").

88.     Despite the overwhelming evidence of Plaintiff's Lyme disease, along with its associated symptoms, Dr. Gwinnell erroneously concluded that Plaintiff suffers from somatic symptom disorder, which "has been present and impairing" since he stopped working and continues through the present date and beyond.

89.     Despite the overwhelming evidence of Plaintiff's Lyme disease, Dr. Dattwyler erroneously concluded that Plaintiff does not have – and never had – Lyme disease.

90.     Like Dr. Brusch, Dr. Dattwyler misapplied the reporting and diagnostic criteria for Lyme disease.

91.     Dr. Dattwyler ignored the opinions of Dr. Raxlen, arbitrarily claiming that his opinions are "clearly out of the mainstream in his approach to Lyme disease and other tick borne infectious disease."

92.     Dr. Dattwyler ignored Plaintiff's subjective complaints and erroneously concluded that there was "no objective physical abnormalities documented in the medical records that would preclude Richard [Z]oeller from working in an office setting."

93.     According to Standard's April 17, 2015, adverse determination, "Mr. Zoeller is entitled to one independent review of the decision to close his LTD claim under the terms of the Group Policy.  With this letter we have completed that review…," and "This concludes the independent

16

review process performed by the Administrative Review Unit."

94.     Therefore, pursuant to 29 C.F.R. §2560.503-1(1), Plaintiff has complied with and exhausted all administrative appeals under the LTD Plan.

## STANDARD'S CONFLICT OF INTEREST

95.     At all relevant times, Standard has been operating under an inherent and structural conflict of interest as Standard is liable for benefit payments due to plaintiff and each payment depletes Standard's assets.

96.     Standard's determination was influenced by this conflict of interest.

*Standard's Cozy Relationship with PsyBar, MES and ECN*

97.     Standard knows, or had reason to know, that PsyBar, MES and ECN serve only insurance companies and never individual claimants.

98.     PsyBar, MES and ECN each hold itself out to the general public as a company that provides services related to administering medical examinations and file reviews among services for which it received direct payment.

99.     PsyBar, MES and ECN enter into service agreements with insurance companies, including Standard, for regular provision of claims related services, including locating and vetting doctors and other consultants interested in performing medical consulting services to the disability industry.

100.     Upon information and belief, Standard pays PsyBar, MES and ECN substantial sums of money to provide file reviews for Standard's insured.

101.     Upon information and belief, Standard is an important client of PsyBar, MES and ECN, accounting for a substantial percentage of their annual revenue.

102.     Because Standard provides substantial revenue to PsyBar, MES and ECN, each has an incentive to provide Standard with reviews that Standard deems favorable in order to preserve

17

Standard as a client.

*Standard's Cozy Relationship with Drs. Yohman, Brusch, Gwinnell and Dattwyler*

103.    Standard knows, or has reason to know, that the medical consultants retained by PsyBar, MES and ECN to complete file reviews and independent medical examinations serve only insurance companies and never individual claimants.

104.    Through PsyBar, MES and ECN, Standard pays Drs. Yohman, Brusch, Gwinnell and Dattwyler substantial sums of money to provide reviews for Standard's insureds.

105.    Because the medical consultants derive substantial income for performing file reviews and/or independent medical examinations for Standard's insureds, each has an incentive to provide file reviews and/or independent medical examinations that Standard deems favorable in order to perform future file reviews and/or independent medical examinations for Standard's insureds.

*Standard has not Reduced its Conflict of Interest*

106.    Standard has failed to take active steps to reduce potential bias and to promote accuracy of its benefits determinations.

## COUNT I

107.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 106 above.

108.    Standard had no legal basis for terminating Plaintiff's benefits.

109.    Under the terms of the LTD Plan, Standard agreed to provide Plaintiff with certain disability insurance benefits in accordance with the terms and conditions set forth.

110.    To date, Standard has failed and refused to pay Plaintiff the benefits to which he is rightfully entitled from April 9, 2015 to the present.

111.    Plaintiff has satisfied all conditions precedent under the LTD Plan and is thus eligible to receive benefits.

112.    Standard's determination that Plaintiff is not totally disabled within the meaning of the

LTD Plan is contrary to the terms of the LTD Plan, contrary to the medical evidence, unreasonable, and an abuse of discretion.

113.    Standard has financial conflicts of interest with respect to handling, monitoring, and eventually denying Plaintiff's disability benefits.

114.    Standard was influenced by its financial conflict of interest, as both the administrator of the LTD Plan and the payor of benefits thereunder, when deciding to deny Plaintiff disability benefits.

115.    The unlawful behavior of Standard is evidenced by the following:

a.  Denying benefit payments to Plaintiff at a time when it knew that he was entitled to said benefits under the terms of the LTD Plan, in bad faith and contrary to the LTD Plan;

b.  Unreasonably withholding payments from Plaintiff knowing his claims for benefits were valid;

c.  Unreasonably failing to pay benefits without having any evidence, substantial or otherwise, supporting its decision to deny benefits;

d.  Completely disregarding Plaintiff's treating physicians' assessment of Plaintiff's medical condition and how it restricts and limits him from performing any occupation without any basis for doing so in violation of 29 C.F.R. §2560.503-1(h)(2)(iv);

e.  Selectively highlighting certain factors in medical reports in order to cast a favorable light on its position, while ignoring the conclusions of Plaintiff's treating physicians regarding the conditions for which they render treatment;

f.  Completely disregarding Plaintiff's subjective complaints, his own assessment of his medical condition and how it restricts and limits him from performing any

occupation in violation of 29 C.F.R. §2560.503-1(h)(2)(iv);

g.  Engaging in a pattern of procedural irregularities in order to advance its own corporate interests in terminating benefits, to the detriment of LTD Plan participants;

h.  Failing to provide a "full and fair review" as it was obligated to do pursuant to 29 C.F.R. §2560.503-1(h)(4);

i.  Failing to provide Plaintiff with an adequate description of any additional material or information necessary to perfect the claim in violation of 29 C.F.R. §2560.503-1(g)(1)(iii);

j.  Sandbagging Plaintiff, in violation of the Department of Labor claims procedure regulations, by adding a new reason for the denial of Plaintiff's claim for LTD benefits as part of its final decision;

k.  Failing to give Plaintiff the opportunity to respond to the opinions of its new doctors (Drs. Gwinnell and Dattwyler) prior to issuing the final denial of Plaintiff's claim;

l.  Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 CFR § 2560.503-1(b), in violation of ERISA;

m.  Consistently acting in its own corporate interests instead of those of the LTD Plan and its participants;

n.  Improperly denying Plaintiff benefits without any information that his condition had improved from the time Standard initially approved his claim; and

o.  Improperly refusing to review medical documentation pertinent to Plaintiff's condition.

116.  Standard breached its fiduciary duty by failing to fairly review and reasonably interpret

the reports prepared by Plaintiff's treating and examining physicians, and failing to consider material relevant to his medical condition.  Instead, Standard created an artificial reason for denying Plaintiff's disability benefits.  Standard selectively highlighted certain factors in medical reports, in order to cast a favorable light on its position while ignoring the conclusions of Plaintiff's treating doctors regarding the condition for which they rendered treatment.

117.   Standard breached its fiduciary duty to Plaintiff by placing its financial interests in reducing its expenses and increasing its profitability above Plaintiff's interests under the LTD Plan to receive disability benefits.

118.   A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008), applies to evaluating the actions of Standard in this case.

119.   Standard was required to discharge its duties "solely in the interests of the participants and beneficiaries of the plan."

120.   Standard violated the higher-than-marketplace standards that ERISA imposes on insurers.

121.   Plaintiff has been forced to bring the instant action as a direct result of Standard's unlawful denial and violations of the LTD Plan and ERISA.

122.   Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Plaintiff is entitled to recover disability benefits under the LTD Plan that have not been paid to date, with interest, and those that will become due in the future.

## COUNT II

123.   Plaintiff repeats and realleges the allegations of paragraphs 1 through 122 above.

124.   By reason of Standard's failure to pay Plaintiff long term disability benefits as due under the terms of the LTD Plan, Plaintiff has been forced to retain attorneys to recover such benefits, for which Plaintiff has and will continue to incur attorney's fees.  Plaintiff is entitled to recover

reasonable attorney's fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

WHEREFORE, Plaintiff demands judgment against Standard:

A.     For the Amount of all long term disability benefits due under the terms of the LTD Plan that have not been paid, together with interest thereon;

B.     Clarifying and declaring that the LTD Plan is obligated to pay Plaintiff long term disability benefits in the future as required by the LTD Plan;

C.     For the costs of this action and Plaintiff's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g); and

D.     For such other and further relief as may be deemed just and proper by the Court.


Dated:  New York, New York
        May 12, 2016

                                RIEMER & ASSOCIATES LLC
                                Attorneys for Plaintiff
                                60 East 42nd Street, Suite 1750
                                New York, New York 10165
                                (212) 297-0700


                        By:     /s/ Scott M. Riemer
                                Scott M. Riemer (SR 5005)